680 A.2d 518

Karen M. LAWHORNE et vir.

v.

EMPLOYERS INSURANCE COMPANY OF WAUSAU.

No. 78, Sept. Term 1995.

Court of Appeals of Maryland.

Aug. 2, 1996.

Robert O. Johnston (Johnston, Rivlin & Foley, L.L.P., on brief), Washington, DC, for Petitioner.

Michael S. DeBaugh (George L. Huber, Lord & Whip, P.A., on brief), Baltimore, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

Presented here is an interpleader action brought by an automobile liability insurer faced with multiple claims against an insured that exceeded the limits of the insured's coverage. The issue is whether the claimants are entitled to interest on $849,680.16 for the period of more than two years that elapsed from the filing of the interpleader action to the payment of that sum into court, a delay principally caused by the bankruptcy of the insured. The circuit court would not order prejudgment interest, and the Court of Special Appeals affirmed in an unreported opinion by a divided panel. We granted the claimants' petition for certiorari in order to consider this issue.

The insurer and original plaintiff in interpleader is the respondent, Employers Insurance Company of Wausau (Em-

ployers). The automobile accident underlying the interpleader action occurred on November 27, 1984. For a period encompassing that date Employers had issued a business automobile policy to Beltran Corporation (Beltran) of Acton, Massachusetts and to its subsidiaries, including Acton Foodservices Corporation (Acton), as additional named insureds. The accident occurred in Cecil County, Maryland when a tractor trailer truck, operated on behalf of Acton by its employee, Louis Wallace Powell (Powell), pulled into the roadway of U.S. Route 301 at its then foggy intersection with Route 299. A pickup truck, towing a horse trailer with two horses and proceeding on U.S. Route 301, crashed into the tractor trailer. Petitioner Karen M. Lawhorne, then wife of petitioner Darrell F. Lawhorne, was a passenger in the pickup truck. Mrs. Lawhorne suffered totally disabling injuries as a result of the accident.[1] Two other persons in the pickup truck suffered bodily injuries in the accident, the operator, Kelley Ann Corrigan, and her mother, Mary Anna Corrigan.

The Lawhornes sued Acton and Powell in December 1985 in the Circuit Court for Anne Arundel County. Employers undertook defense. Unknown to the Lawhornes and to Employers, Acton had filed a petition for bankruptcy in Massachusetts in June 1985.

The record is unclear as to whether Acton was the subject of one, or more than one, bankruptcy proceeding and, if more than one, precisely when any earlier proceeding terminated and any later proceeding commenced. It is clear, however, that on or about April 17, 1986, Beltran and various of its subsidiaries filed petitions under the Bankruptcy Code which were consolidated in the District of Massachusetts and that

---

1. We were advised at oral argument that Mrs. Lawhorne died after the parties' briefs were filed in this Court. Although we find no indication that a person has been substituted for Mrs. Lawhorne as a party, see Maryland Rules 8–401(b) and 2–241, Mr. Lawhorne, one of the petitioners, has standing in his own right, as an original defendant in the interpleader action, to pursue the appeal.

 In this opinion we shall refer to the applicants for review in this Court, as "the petitioners" or "the Lawhornes."

the consolidated proceedings included Acton. There is also an evidentiary conflict over the earliest date as of which Employers was on notice that Acton was in bankruptcy. Imprecision and conflicts on these aspects of the matter before us are immaterial, in view of our ground of decision, explained below.

Employers filed the subject interpleader in the Circuit Court for Anne Arundel County on April 27, 1987. It named as defendants Employers' insureds, the bodily injury claimants, and property damage claimants, including a subrogated insurer. The complaint alleged that Employers "will pay into the registry of this Court the sum of $1,000,000.00, less credit for payments heretofore made...." The relief requested by the complaint included a court order "directing and authorizing [Employers] to deposit with the Clerk of this Court the sum of $1,000,000, less credit for amounts previously paid ... and, upon such payment, [discharging Employers] from any and all further obligations under the terms of its policy of insurance."[2] Employers requested that the defendants be ordered to "interplead and settle among themselves their rights and claims" to the amount payable under the liability policy, and that the defendants be enjoined from instituting or further prosecuting actions arising out of the accident.

Answering the complaint for interpleader in June 1987, the Lawhornes raised no objection to the use of interpleader and requested that the "appropriate sum" be paid into court and invested in an interest-bearing account(s). Employers did not deposit the balance of the liability coverage with the court, and no party at that time sought a court order requiring the deposit.

---

2. Part IV.A.2 of the Employers policy in part states: "Our payment of the LIABILITY INSURANCE limit ends our duty to defend or settle." This aspect of interpleader actions filed by liability insurers is not involved in the issue before us, and we intimate no opinion thereon. Some of the legal problems involved in interpleaders brought by liability insurers are discussed in Morris, *The Use of an Interpleader Action to Resolve Multiple Claims from One Accident*, 51 Ins. Council J. 99 (Jan. 1984).

Almost two years later, on May 30, 1989, the Lawhornes moved for an order directing Employers to deposit the balance of the policy limits in court. By an order of June 29, 1989, the circuit court directed Employers to deposit that balance, namely, $849,680.16. During the pendency of the interpleader Employers had settled the property damage claims and had advanced $81,324.31 for the care of Mrs. Lawhorne. The order directing deposit of the balance further directed the court clerk to make a distribution of that balance to the bodily injury claimants in specified amounts upon which they obviously had agreed. Employers paid the balance into court on the day immediately following passage of the order to deposit. The Lawhornes and their counsel received $712,-180.16.

During the period between the filing of the interpleader and the deposit of the funds, the parties to the interpleader, and others, were occupied in efforts to settle the tort claims. These settlement negotiations involved the trustee in bankruptcy of Acton because, as explained below, the amount available under a policy of liability insurance issued to a debtor against whom tort claims are asserted is an asset of the debtor's bankruptcy estate. Further, inasmuch as Employers was willing to pay policy limits, Employers advised the Lawhornes to negotiate with Acton's excess liability carrier, Mission Insurance Company (Mission), a California-based insurer. In late 1986 or early 1987 Mission was placed in liquidation in California. Consequently, the settlement negotiations expanded beyond the parties to the interpleader action and Acton's trustee in bankruptcy to include the liquidator of Mission and the Massachusetts Insurance Insolvency Fund (MIIF).

The lengthy negotiations led to a structured settlement under which Employers' contribution was to be an annuity for Mrs. Lawhorne purchased from an affiliate of Employers. When the settlement agreement was circulated for signature, however, the Acton trustee concluded, after analyzing claims and assets of the bankruptcy estate, that Acton could not fund its portion of the settlement. In addition, MIIF advised that

it did not provide the level of coverage that had been anticipated. The long awaited settlement fell through.

The Lawhornes then concentrated their efforts on lifting the bankruptcy stay. It was lifted by the Bankruptcy Court on May 15, 1989. There followed in this interpleader action the Lawhornes' motion for an order directing the deposit of funds, described above, and a counterclaim by the Lawhornes seeking interest on the net of the liability policy limits. That counterclaim was decided favorably to Employers on its motion for summary judgment. That interest issue, however, was not resolved until May 1994, for reasons that are not relevant to the instant matter.

Petitioners contend that prejudgment interest is awardable in this case under: (1) the law governing interpleader actions; (2) Maryland Code (1974, 1995 Repl.Vol.), § 11–301 of the Courts and Judicial Proceedings Article (CJ); and (3) the law governing constructive trusts.

## I

Petitioners give the following explanation of their first theory for prejudgment interest:

> "The requested award does not derive from the mere act of filing the interpleader action. Nor do the Lawhornes seek an award of interest based on an obligation to pay interest, such as that created by a note or a loan. Rather it is simply bedrock logic that leads to the conclusion that the stakeholder should pay interest, where it would be inequitable not to make it do so."

Appellants' Brief at 14. In support of this position petitioners cite decisions from federal courts. Analysis of petitioners' argument begins with some background on interpleader in Maryland and in federal practice.

Chief Judge Murphy, writing for this Court in *Farmers & Mechanics Nat'l Bank v. Walser*, 316 Md. 366, 558 A.2d 1208 (1989), reviewed the evolution of modern interpleader. It "is derived from the chancery practices of the eighteenth and nineteenth centuries...." *Id.* at 372, 558 A.2d at 1211. Dur-

ing the nineteenth century, due to the work by Professor Pomeroy, courts rather rigidly considered that there were four requirements for a strict bill of interpleader. *Id.* at 373, 558 A.2d at 1211. In addition to a *res* claimed by two or more parties that was held by a stakeholder who had no interest in the *res* nor any independent liability to the claimants, " '[a]ll [the claimants'] adverse titles or claims must be dependent, or be derived from [a common] source." *Id.* (quoting 4 J. Pomeroy, *Equity Jurisprudence* § 1322, at 906 (5th ed.1941)). In *Farmers & Mechanics Nat'l Bank,* we further explained how "[t]he viability of the classic interpleader requirements was further eroded" by Fed.R.Civ.P. 22 governing interpleaders. 316 Md. at 375, 558 A.2d at 1212. That federal rule in part provides that "[i]t is not ground for objection to the joinder that the claims of the several claimants or the titles on which their claims depend do not have a common origin or are not identical but are adverse to and independent of one another. . . ." Fed.R.Civ.P. 22. We then pointed out that, in 1961 when this Court adopted former Subtitle BU, "Interpleader," of the Maryland Rules of Procedure dealing with Special Proceedings, the "rules established a procedure for interpleader which was closely analogous to the federal practice, drawing upon both the federal rule's language and the case law which arose from it." 316 Md. at 379–80, 558 A.2d at 1214. Interpleader in Maryland courts is now governed by Maryland Rule 2–221.

Rule 2–221(a) in part provides that "[a]n action for interpleader or in the nature of interpleader may be brought against two or more adverse claimants who claim or may claim to be entitled to property." An interpleader complaint "shall specify the nature and value of the property and may be accompanied by payment or tender into court of the property." *Id.* "After the defendants have had an opportunity to answer the complaint and oppose the request for interpleader," the court is to schedule a hearing. Rule 2–221(b). Following the hearing the court is authorized to enter an order with a variety of provisions, among which is one directing

"the original plaintiff (the party bringing the interpleader action) to deposit the property or the value of the property into court to abide the judgment of the court or to file a bond with such surety as the court deems proper, conditioned upon compliance by the plaintiff with the future order or judgment of the court with respect to the property[.]"

Rule 2–221(b)(3).

There is authority from nineteenth century chancery practice under which the plaintiff in interpleader "must bring the money or thing claimed into Court, so that he cannot be benefitted by the delay of payment, which may result from the filing of his bill." *Atkinson v. Manks & Holroyd,* 1 Cow. 691, 704 (N.Y.1823), an appeal from the Court of Chancery. Maryland Rule 2–221 changes that practice. Employers was not required to deposit the net available insurance until ordered to do so by the court.

Neither Md. Rule 2–221 nor Fed.R.Civ.P. 22 requires that the *res* be deposited upon institution of a complaint for interpleader. On the other hand, one of the conditions for the conferral of jurisdiction on United States District Courts under the Federal Interpleader Act is that the plaintiff have deposited the money or property in the registry of the court, or have given bond. 28 U.S.C. § 1335(a)(2).[3] Commentators on federal practice have pointed out that, as a result of this difference "it may be to the advantage of the stakeholder to bring suit under Rule 22(1)...." 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1703, at 499 (2d

---

**3.** Two of the major differences between rule and statutory interpleader in the federal courts are in the areas of subject matter and in personam jurisdiction. Subject matter jurisdiction in rule interpleader cases is based on the general federal question and diversity of citizenship grants of jurisdiction. Statutory interpleader requires only a stake of $500 and diversity of citizenship between two or more of the adverse claimants. Further, personal jurisdiction in a rule interpleader case is circumscribed by the territorial limits in Fed.R.Civ.P. 4, while nationwide service of process is available in statutory interpleader. See 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1703 (2d ed.1986).

ed.1986). Because of this difference, "it is possible that the stakeholder could have the use of all or part of the disputed fund or property for a longer period of time if he proceeds under Rule 22(1) rather than the statute." *Id.*[4]

By way of further background, we note that the type of interpleader presented here differs from strict nineteenth century interpleader in that the adverse claims do not rest on a common title. The classical model may be illustrated by the life insurer which initiates an interpleader over the death benefits payable on the death of the insured, naming as defendants the originally designated beneficiary and one designated in a change of beneficiary that the original beneficiary challenges. In the illustration, the claims are mutually exclusive, so that if the insurer pays the wrong claimant, it may be required to pay the same obligation twice.

Justification for the type of interpleader utilized by Employers in the instant matter is explained by Hazard & Moskovitz, *An Historical and Critical Analysis of Interpleader,* 52 Cal. L.Rev. 706 (1964). The authors state:

"A more complicated but modernly more important type of case is where a liability insurance carrier is confronted with claims against its insured that exceed the limits of the policy. In this type of case, the middleman does not face the risk of paying twice, for he is acquitted upon payment. There is a risk, however, that the members of the group may be treated disproportionately, for if the first to come forward is fully served, there may be nothing left for the tail-enders. It is unfair that a group similarly situated be treated dissimilarly, and especially that preference among them be shown to the hoggish. There is still more at stake in the typical case of the liability policy, for the claims in such a situation, being personal injury claims, are indeterminate in amount in advance of settlement or adjudication. Because settling one share cuts down the pie available for

---

4. "The provision for payment into the registry of the court has been included in each of the [federal] interpleader acts since 1917...." 3A J. Moore, *Moore's Federal Practice* ¶ 22.10, at 22–91 (2d ed.1995).

another, the settlement process easily breaks down into a circular interdependency. Interpleader invites supervision of settlement, and enhances the possibility that trials may be avoided to fix the shares."

*Id.* at 759 (footnotes omitted).

This type of interpleader has been described as involving "pie-slicing" adversity. Note, *Can Statutory Interpleader Be Used As A Remedy By the Tortfeasor In Mass Tort Litigation?*, 90 Dick. L.Rev. 439, 445 (1985).[5] The Court of Special Appeals has recognized the use of pie-slicing interpleader by an officers and directors liability insurer that was faced with a number of suits against its insureds following the collapse of a savings and loan association. *See Faulkner v. American Casualty Co.*, 85 Md.App. 595, 619–25, 584 A.2d 734, 746–48, *cert. denied*, 323 Md. 1, 590 A.2d 158 (1991).

 Inasmuch as pie-slicing interpleader is recognized, not to protect the insurer from double liability on the same claim, but to attempt to avoid a multiplicity of suits, the question arises whether pie-slicing interpleader may be invoked by a liability insurer in a state that does not recognize direct actions by tort claimants against the tortfeasor's liability insurer. That question was answered for the federal courts by *State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967). State Farm had coverage of $20,000 per occurrence on a pickup truck that had collided in California with a Greyhound bus, resulting in the deaths of two persons and bodily injuries to thirty-five persons in addition to the operator of the truck. The insurer filed in

---

5. One federal court rejected the argument that pie-slicing interpleader would not lie because the claimants did not have adverse claims to each other, by observing as follows:

"It might, by the same reasoning, be said that 100 persons adrift in the ocean with but one small lifeboat in sight were not adverse to each other. We fear, however, that the concept of non-adversity would dwindle in direct proportion to the number of swimmers reaching the boat."

*Commercial Union Ins. Co. v. Adams*, 231 F.Supp. 860, 863 (S.D.Ind. 1964).

Oregon under the federal interpleader statute. The United States Court of Appeals vacated an injunction issued by the trial court because Oregon did not permit direct actions against insurance companies until judgments were obtained against the insureds. *Id.* at 528, 87 S.Ct. at 1202. The Supreme Court reversed, holding that, under the language of the statute in effect since 1948, interpleader would lie "where adverse claimants 'may claim' benefits as well as where they 'are claiming' them." *Id.* at 532, 87 S.Ct. at 1204.

Maryland, like Oregon, is not a direct action state. *Washington Metropolitan Area Transit Auth. v. Queen,* 324 Md. 326, 331, 597 A.2d 423, 425 (1991). Indeed, since Chapter 204 of the Acts of 1924, the Maryland Insurance Code has provided that

"if an execution upon any final judgment against the assured is returned unsatisfied ... in an action brought by the injured ... then an action may be maintained by the injured ... against the insurer under the terms of the policy for the amount of any judgment recovered in such action, not exceeding the amount of the policy...."

Md.Code (1957, 1994 Repl.Vol.), Art. 48A, § 481. The statute has been interpreted to permit a direct action "[o]nce there is a verdict or judgment in the tort action." *Queen,* 324 Md. at 332, 597 A.2d at 426; *see Allstate Ins. Co. v. Atwood,* 319 Md. 247, 257, 572 A.2d 154, 159 (1990). *See also Bass v. Standard Accident Ins. Co.,* 70 F.2d 86, 87–88 (4th Cir.1934).

Further, Md. Rule 2–221, like 28 U.S.C. § 1335 (but unlike the text of Fed.R.Civ.P. 22(1)), permits interpleader against "adverse claimants who claim or may claim to be entitled to property." This inclusion of the "may claim" language in Rule 2–221 produces the result approved in *State Farm v. Tashire, supra.* Interpleader in Maryland includes pie-slicing adversity between claimants for personal injury damages.

The foregoing analysis highlights the inconsistency between petitioners' claim for prejudgment interest and the Maryland law governing the award of prejudgment interest.

A claim against the tortfeasor's insurer would not even be recognized prior to judgment and outside of interpleader, because of the direct action bar. In addition, the claim of one claimant may be contingent as to liability, if another claimant, seeking an increase in that claimant's share of the pie, demonstrates that the stakeholder's insured is not liable to the first claimant. Most important, where, as here, the adverse claims are based on personal injuries, the claims are unliquidated. Maryland law does not recognize prejudgment interest on tort claims for personal injuries, and it is not assessed at the time the claims are liquidated by judgment.

In *Taylor v. Wahby*, 271 Md. 101, 314 A.2d 100 (1974), we recognized "that the usual tort rule in regard to unliquidated claims for damages [is] that interest runs from the time of the verdict." *Id.* at 113, 314 A.2d at 106. *Taylor* was an action by a real estate broker who successfully claimed tortious interference with his listing contract, and the tort damages included the amount of lost commission on which the trial court allowed prejudgment interest. Because the "claim was unliquidated and not reasonably ascertainable until the verdict," this Court applied the usual tort rule and reversed the award of prejudgment interest. *Id.* See also *I.W. Berman Properties v. Porter Bros.*, 276 Md. 1, 16, 344 A.2d 65, 74–75 (1975) (recognizing general tort rule); 4 Restatement (Second) of Torts § 913(2) (1979) ("Interest is not allowed upon an amount found due for bodily harm, for emotional distress or for injury to reputation, but the time that has elapsed between the harm and the trial can be considered in determining the amount of damages."); 1 D. Dobbs, *Law of Remedies* § 3.6(1), at 336 (2d ed. 1993) ("[T]he general rule ... apart from statute, [is that] prejudgment interest is not recoverable on claims that are neither liquidated as a dollar sum nor ascertainable by fixed standards.").

Pie-slicing interpleader, involving adverse personal injury claimants, merely anticipates judgments in favor of those claimants against the tortfeasor, and anticipates that claims on those judgments will then be asserted against the stakeholder. That is not a basis for permitting the recovery in interpleader

of a form of damages, *i.e.*, prejudgment interest, that the claimants could not recover at the conclusion of the underlying tort claims.

Further, absent a right, absolute or discretionary, to recover prejudgment interest on the underlying tort claim, we are unable to discern any basis for the obligation, claimed by the petitioners, of the stakeholder to pay prejudgment interest. If the adverse claimants to the insurance fund were unable to get service on Acton or Powell, they would not even be able to reach the insurance fund by an attachment on original process. *Belcher v. Government Employees Ins. Co.*, 282 Md. 718, 387 A.2d 770 (1978). By initiating an interpleader over the fund, Employers acknowledged that it would pay the policy limits, and that it would deposit the fund when it was required to do so under Md. Rule 2–221, *i.e.*, when the court ordered the deposit to be made. Requiring the stakeholder to pay interest on the policy limits for a period prior to the court ordered deposit may, depending on the terms of the policy, require the insurer to pay more than it has promised to pay on behalf of the insured.

In *Nationwide Mut. Ins. Co. v. Mabe*, 342 N.C. 482, 467 S.E.2d 34 (1996), the claimants in a pie-slicing interpleader sought prejudgment interest, but the policy defined damages to include prejudgment interest awarded against the insured. 467 S.E.2d at 38–39. The effect was that prejudgment interest was subject to the cap of the policy limits. *Id.* at 40. Alternatively, the court considered prejudgment interest to be, independently of the contract, a part of tort damages and subject to the policy limits. *Id.*

In the policy that Employers issued to Beltran and its subsidiaries the relevant promise of Employers is as follows:

"In addition to our limit of liability, we will pay for the insured:

. . . .

"5. All interest accruing after the entry of the judgment in a suit we defend. Our duty to pay interest ends when we pay or tender our limit of liability."

In other words, Employers promises to pay post-judgment interest in excess of limits, but only up to the date when the policy limits are paid or tendered. The interest claim in the instant matter seeks more than the policy provides.

If the adverse claimants in this interpleader action had pursued their claims against the tortfeasors to judgment and then brought an action against Employers for the amount of the judgment recovered in the tort action, the recovery against Employers could "not exceed[ ] the amount of the policy." Art. 48, § 481. Consequently, it would also be inconsistent with § 481 for us to require prejudgment interest here.

We glean from petitioners' arguments the contention that the entire unpaid balance of the policy limits should be considered as a fund in gross, that liability on the insurer's part to pay the fund is admitted by the filing of the interpleader, and that the fund in gross is a liquidated amount, so that interest in gross for the period from the institution of the interpleader to the making of the deposit should be included in the deposit, to be thereafter distributed in accordance with the shares determined in phase two of the interpleader proceeding.[6] This argument by petitioners is inconsistent with the analysis set forth above. It is also inconsistent with Md. Rule 2–221. Requiring interest from the date of filing is the same as treating the owners in gross as the owners of the fund from the time the interpleader is instituted. Maryland Rule 2–221 allows deferral of the deposit until the court has determined that the case is an appropriate one for interpleader and directs that the action proceed to phase two. There is no assurance that, simply because the stakeholder files an interpleader, the adverse claimants and the court will agree that the procedure is appropriate. In addition, petitioners' argument is contrary to one of the few liability insurance, pie-

---

**6.** Of course, once an interpleaded fund has been deposited, "[t]he usual and general rule is that any interest on [it] follows the principal and is to be allocated to those who are ultimately to be the owners of that principal." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 162, 101 S.Ct. 446, 451, 66 L.Ed.2d 358, 365 (1980).

slicing interpleader, bodily injury claimants' cases that considers prejudgment interest. In *Canal Ins. Co. v. Pizer*, 183 Ariz. 162, 901 P.2d 1192 (1995), the court rejected the "in gross" analysis because a court could find that the individual claims, once liquidated, did not exhaust the policy limits.

The only decision disclosed by our research that directly supports petitioners' position is *First of Georgia Ins. Co. v. Riggle*, 540 So.2d 766 (Ala.Civ.App.1989). That court reasoned that, "[o]nce the company pledged to deposit the stake with the court and disavowed any rights in the stake, the interest earned thereon became the property of the claimants." *Id.* at 768. For all the reasons heretofore set forth, we are not persuaded by that analysis.

Nor are we persuaded by the three federal cases cited to us by petitioners. Two of them do not involve liability insurers or pie-slicing adversity. *Amoco Transport Co. v. Dietze, Inc.*, 582 F.Supp. 804 (S.D.N.Y.1984), involved the amount of $470,728.84 in freight charges that the stakeholder had incurred in one month. Three groups of claimants were joined. One group did not appear, the second was a broker whose commission was deducted from the fund, and the balance was awarded to the third claimant, with prejudgment interest on the principal amount of the bond that the stakeholder had filed under 28 U.S.C. § 1335. 582 F.Supp. at 805. *Gelfgren v. Republic Nat'l Life Ins. Co.*, 680 F.2d 79 (9th Cir.1982), involved the sum of $30,000 in death benefits under a union welfare fund in a Rule 22(1), federal question, interpleader. Prejudgment interest was awarded. Neither of these cases involved underlying tort claims for personal injuries. We do not have before us the question of whether, under Maryland interpleader practice, a liquidated claim, that could support prejudgment interest when asserted independently by the claimant, continues to bear that characteristic when the claim is joined in an interpleader proceeding.

The third case relied upon by petitioners is *Unigard Mut. Ins. Co. v. Abbott*, 732 F.2d 1414 (9th Cir.1984). Primary and excess liability insurers deposited the limits of their compre-

hensive general liability policies with the court when they brought an interpleader action under the federal statute. *Id.* at 1416. Because of the facts surrounding the accident, the claimants successfully contended that the automobile liability policies issued by the same insurers to the same insured also covered the occurrence so that there was available to the claimants double the amount of insurance deposited. *Id.* at 1418. There was also evidence that, at the time of the institution of the interpleader, the insurers were aware of the possibility of additional coverage under the automobile policy. *Id.* When the claimants raised the possibility of additional coverage under the automobile policy, the court ordered the insurers to post a bond in the amount of the automobile policy limits. *Id.* at 1416. After trial the court also awarded interest in an amount equal to the amount earned in interest on the deposit of the comprehensive liability policy limits. *Id.* at 1418. The court reasoned that the insurers were obligated by 28 U.S.C. § 1335 to post a bond or deposit when the interpleader was instituted, *id.*, and the relief granted seems to have been a remedy for that violation. In any event, under Md. Rule 2–221 there is no similar requirement for deposit or bond when the interpleader is filed.

Accordingly, petitioners' claim for prejudgment interest cannot be founded on the Maryland law of interpleader.

## II

■ The General Assembly has responded to the problem of delay in the payment of automobile liability claims by CJ § 11–301 under which the court may assess prejudgment interest for unnecessary delay.[7] Petitioners assert that their

---

7. CJ § 11–301 reads:

"(a) *Defendant causing unnecessary delay.*—In an action for bodily injury arising from the operation of a motor vehicle in which a money judgment is entered in favor of the plaintiff, the court may assess interest against the defendant at the rate of not more than 10 percent per annum on the amount of the judgment from a time not earlier than the time the action was filed if it finds that the defendant caused unnecessary delay in having the action ready or set for trial.

claims were unnecessarily delayed, but the circuit court concluded that the petitioners' contention could not withstand summary judgment, and the Court of Special Appeals agreed. We agree with the lower courts.

Petitioners' contention faces the insuperable hurdle that Acton's bankruptcy stayed the interpleader action. The Federal Bankruptcy Code provides that the filing of a bankruptcy petition "operates as a stay, applicable to all entities, of—(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]" 11 U.S.C. § 362(a)(3). Property of the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id.*, § 541(a)(1). Both the First Circuit, where Acton's bankruptcy case was filed, and the Fourth Circuit, hold that a liability insurance policy of a debtor/insured and the policy proceeds are property of the debtor/insured's bankruptcy estate. *Tringali v. Hathaway Mach. Co.*, 796 F.2d 553, 560 (1st Cir.1986); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1001 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). Accordingly, because Acton's bankruptcy petition predated Employers' filing of the interpleader action, Employers could not have legally paid the funds into the court, even if it had elected to do so, without an order from the bankruptcy court in Massachusetts lifting the automatic stay.

In their answer to the interpleader complaint petitioners asked that Employers be ordered either to pay the funds into the registry of the court or to place them with a trustee for investment in an interest bearing account(s). The automatic stay removed the court's power to order Employers to do so. 11 U.S.C. § 362(a)(3). Petitioners' only recourse was to seek a lift of the stay, *see Tringali*, 796 F.2d at 563, which they did some six months after the interpleader was instituted. Peti-

---

"(b) *Delay caused by defendant's insurer or counsel.*—For the purposes of this section, a delay caused by the defendant's insurer or counsel is deemed an unnecessary delay caused by the defendant."

tioners bore the burden of proving cause for lifting the stay or that Acton did not have equity in the proceeds and that the proceeds were not necessary to Acton's effective reorganization. 11 U.S.C. § 362(d).

After Acton's trustee opposed lifting of the stay, the Lawhornes agreed to postpone a hearing on their motion to lift the stay because settlement negotiations were in progress. Although those negotiations dragged on for more than one and one-half years, the attorney for the Lawhornes stated in a deposition that he was unaware of any action taken by Employers that "would constitute less than best faith efforts to effectuate the contemplated settlement."

There was insufficient evidence of unreasonable delay on the part of the stakeholder.

### III

The remaining contention is that Employers was unjustly enriched by the amount of interest earned on the net policy proceeds in the period between commencement of the interpleader and the deposit of the funds. Using the label, "constructive trust," petitioners seek a restitutionary remedy.

The argument rests on a theory that there is a conversion, in equity, of the ownership of the fund in gross immediately upon the filing of the interpleader action. For the reasons stated in Part I, we have held that that theory is not part of the Maryland law of interpleader. Consequently, there has been no unjust enrichment.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONERS.*