574 A.2d 320
**ANDERSON–STOKES, INC.**
v.
**Khalil MUSLIMANI, et al.**
No. 1487 Sept. Term, 1989.
Court of Special Appeals of Maryland.
June 4, 1990.

Richard S. Phillips (Walsh & Phillips, P.A., on the brief), Easton, for appellant.

John E. Bloxom, Pocomoke City, for appellee, Decatur Realty, Inc.

George E. Bahen, Salisbury, on the brief for appellee, Muslimani.

Argued before MOYLAN, WILNER and CATHELL, JJ.

WILNER, Judge.

This is a suit for commissions on the sale of real estate. It involves two brokers and the sellers of the property.

The property in question is the Twin Towers Motel in Pocomoke. It was owned by a corporation known as Olympic Resorts, Inc., which, in turn was wholly owned by two brothers, Salim (Sam) and Khalil (Lee) Muslimani. The Muslimani brothers had been trying to sell the motel for

some time. In the summer or fall of 1987, they had it listed with a Virginia broker. In September, 1987, Sam Muslimani contacted C. Ames Byrd, a broker in Pocomoke trading as Decatur Realty, Inc., and asked him to try to sell the property. Notwithstanding the Virginia listing, Decatur began to advertise the property.

The Virginia listing expired in November. Sam then told Byrd that he would not list the property with anyone but would pay a commission to any realtor who sold it. He specifically asked Decatur to try to sell it and promised a commission "on any prospects that we obtained." The asking price at that time was $1.5 million; the standard commission was 10% but the expected commission was negotiable. Decatur continued to advertise the property, not only along the Eastern seaboard but in Baltimore papers as well. It developed a package of material concerning the motel which it sent to several people.

On December 21, 1987, one Reynold Palmer called Mr. Byrd. He said that he had seen one of the advertisements and was interested. Byrd sent him a package of information. On the 27th, at Palmer's request, Byrd sent him some additional information, including financial statements and an appraisal. On the 30th, Palmer told Byrd that he had a partner, Jarrett, with whom he needed to discuss the matter. Byrd was in contact with Palmer several times during January and February. Finally, on March 12, 1988, Palmer, Jarrett, and Byrd met at the motel with Sam Muslimani. After going through the motel, a tour that Mr. Byrd said took about three hours, Palmer, Jarrett, and Sam Muslimani reached an agreement and shook hands on a contract; Palmer and Jarrett agreed to pay $1.2 million for the motel and the sellers agreed to a $50,000 commission. Byrd was instructed to prepare a written contract. Jarrett gave him a card with his and Palmer's names so that he could have the correct spelling.

On March 20, Byrd met with Sam and Lee at Lee's house in Virginia and went over the terms. Following that meeting, Byrd prepared two contracts, one at $1.2 million with-

out any seller financing, as instructed, and one at $1.3 million with seller financing. On March 21, the parties met again. Jarrett told the group that he had discussed the matter with his accountant and that, as a result, he and Palmer were unable to pay the $1.2 million. They counter-offered $900,000, which the Muslimanis rejected.

The Muslimanis asked Byrd to continue his efforts, which he did. He called Palmer a number of times to see if he and Jarrett could come up in their offer, asking at one point whether they would pay $1.1 million. Sam Muslimani had told Mr. Byrd that he might be willing to take less than $1.2 million, but no specific figure was mentioned. Finally, on March 28, Palmer told Byrd that he was no longer interested.

Unbeknownst to Mr. Byrd, there was another player in the game. Virginia D'Aquila, a broker with the Ocean City firm of Anderson–Stokes, Inc., had had some past dealings with Mr. Jarrett and, according to her, had mentioned the Twin Towers property to him about a year earlier. In February, 1988, following a call from an intermediary, Ms. D'Aquila made an appointment to look at the property. *Semper paratus,* she took with her an exclusive listing agreement which Sam Muslimani signed. Through this agreement, Olympic Resorts, Inc. purported to list the property with Anderson–Stokes for four months, with an asking price of $1.2 million. Mr. Muslimani never mentioned this agreement to Mr. Byrd throughout their dealings.

Some time in April, according to Ms. D'Aquila, Mr. Jarrett asked if she could work out financing to enable him and Palmer to buy the motel. She was aware at the time that Mr. Byrd had shown them the motel, but she decided not to contact Byrd. Instead, she apparently referred Jarrett to a loan officer at Maryland National Bank and then prepared a contract at $1,035,000 ($1,000,000 for the sellers, $35,000 commission for Anderson–Stokes), which the parties signed.

Mr. Byrd found out about the sale from street talk and called Sam Muslimani. Muslimani confirmed that he and

his brother had sold the property. He told Byrd, however, that when Ms. D'Aquila first informed him that she had some interested buyers, she had refused to disclose their identities and that the contract was in the name of PJ's Incorporated. It was not until he saw the deposit check that he realized that the buyers were Palmer and Jarrett. Sam said that he would call Anderson–Stokes and that, if the buyers turned out to be Byrd's prospects, he should get a commission. Muslimani apparently did contact D'Aquila, who called Byrd and informed him that the buyers were her prospects.

Aware that Byrd might be making a claim, the Muslimanis insisted that Anderson–Stokes indemnify them against any such claim, which, at settlement on the property, they did through a written indemnity agreement. As a precautionary measure, in light of this agreement, Ms. D'Aquila had Lee Muslimani sign the listing agreement which, to that point, had been signed only by his brother Sam. His signature was affixed at the time of settlement, in May, 1988.

Believing itself to be the procuring cause of the sale, Decatur sued the sellers (Olympic and the Muslimanis) in the Circuit Court for Worcester County for a commission of $35,000. Olympic and the Muslimanis filed a third-party action against Anderson–Stokes for indemnification. After a non-jury trial, the court entered judgment as demanded by the plaintiff and third-party plaintiffs—$35,000 in favor of Decatur against the sellers and $35,000 in favor of the sellers against Anderson–Stokes. Those judgments were based on two principal findings made by the court: (1) because the seller was a corporation in which Sam Muslimani was neither an officer nor director, but merely a stockholder, the listing contract obtained by Anderson–Stokes was not valid; and (2) Decatur in any event was the procuring cause of the sale. Anderson–Stokes has appealed, challenging both of those findings.

### The Listing Contract

■ We cannot accept the court's conclusion that the Anderson–Stokes listing contract was invalid. The fact is that both Muslimani brothers eventually signed it, presumably on behalf of the corporation; moreover, there was absolutely no evidence in the record to support a conclusion that Sam Muslimani, who signed the contract in February, 1988, was without authority to do so. That was not an issue in the case until the court *sua sponte* made it one through remarks from the bench, and neither side presented any evidence with respect to it. If the judgments rested on that conclusion alone, we would need to reverse them. But they do not. The validity of the listing contract is irrelevant, as neither Decatur's claim against the sellers nor the sellers claim against Anderson–Stokes relies upon it.

Decatur's claim is based solely on the theory that it was the procuring cause of the sale; any arrangement that the sellers had with another broker, whether valid or invalid, is immaterial insofar as their liability to Decatur is concerned. The sellers' claim is based on the indemnity agreement, not the listing. They paid Anderson–Stokes a commission with the express understanding that they would be indemnified against any liability to Decatur. The listing contract has no bearing on whether Anderson–Stokes is liable under the indemnity agreement. As Anderson–Stokes does not present any challenge to the validity of the indemnity agreement, the sole issue here is whether the court erred as a matter of law or was clearly erroneous in its findings of fact with respect to whether Decatur was the procuring cause of the sale.

### Procuring Cause

■ As the circuit court noted, there have been literally dozens of cases in the Court of Appeals dealing with a broker's entitlement to commissions on the sale of real estate. Where the entitlement hinges on specific contractual language, that language, of course will control. Where, as here, the entitlement depends not on specific contractual

terms but more generally on the employment of the broker, the issue ordinarily becomes whether the broker was the procuring cause of the ultimate sale. *See* Md.Real Prop. Code Ann. § 14–105. Unfortunately, like the notion of "probable cause," the concept of "procuring cause" is deceptively simple, especially when the broker seeking the commission was not directly involved in the final approach or negotiation leading to the signing of the contract of sale. The Court has expressed the law in a number of ways.

In *Hampton Park v. T.D. Burgess Co.,* 270 Md. 269, 311 A.2d 35 (1973), the Court reviewed some earlier cases on this subject. At 280, 311 A.2d 35, it noted the long-standing rule, first enunciated in *Keener v. Harrod,* 2 Md. 63, 71 (1852), that:

> "[T]he mere fact of the agent having introduced the purchaser to the seller, or disclosed names by which they came together, to treat, will not entitle him to compensation; but, if it appears that such introduction or disclosure was *the foundation on which the negotiation was begun and conducted, and the sale made,* the parties cannot afterwards, by agreement between themselves, withdraw the matter from the agent's hands, so as to deprive him of his commission."

(Emphasis added by *Hampton Park* Court.)

*See also Steele v. Seth,* 211 Md. 323, 127 A.2d 388 (1956) and *Jones v. Adler,* 34 Md. 440 (1871).

The Court also recited, however, several other expressions from earlier cases. From *Cowal v. Marletta,* 216 Md. 222, 228, 139 A.2d 712 (1958) came the thought that whether a broker's efforts are to be regarded as the procuring cause of a sale is to be determined not on the basis of how much or how little he did but on the basis of "whether the efforts he did make were in fact the proximate cause of interesting the purchaser, and his ultimate agreement to buy." From *Bearman v. Roland Park Co.,* 218 Md. 515, 518–19, 147 A.2d 697 (1959) and *Sanders v. Devereux,* 231 Md. 224, 231, 189 A.2d 604 (1963) comes the holding that: "One satisfies

the legal test as a procurer of the purchaser if the testimony permits the inference that the sale was accomplished as a result of his action in discovering the purchaser, acquainting him with the property and referring him to the seller for further negotiations."

The real difficulty is not with the statement of these general principles, but with their application. In *Warshawsky v. Traub*, 156 Md. 597, 604, 144 A. 833 (1929), the Court focused more particularly on the kind of situation now before us, quoting with approval the following statement in 4 R.C.L. 319:

> " 'If the success of the transaction is directly attributable to the broker originally employed, his right to his commissions cannot be defeated by the mere fact that the negotiations were conducted, or the transaction finally consummated, through the medium of another broker, even though the terms of the first negotiations may have been varied. Where a prospective purchaser has been introduced to the owner by one broker and the negotiations are pending and have not fallen through, the owner cannot, with knowledge of the facts, complete the purchase with another agent, and avoid his liability for the commission due to the first broker. Thus the law will not permit one broker who had been intrusted with the sale of land, and is working with a customer whom he has found, to be deprived of his commission by another agent stepping in and selling to the customer <u>for a price less than the first broker is empowered to receive.</u>' "

(Emphasis added.)

The underscored part of that holding is most germane to the instant proceeding; it has been repeated in subsequent cases. In *Leimbach v. Nicholson*, 219 Md. 440, 447, 149 A.2d 411 (1959) and *MacWilliams v. Bright*, 273 Md. 632, 635–36, 331 A.2d 303 (1975), the Court made the point:

> "[A]n owner may not take advantage of a broker's services to secure a prospective purchaser and then deprive him of his commissions by selling directly to his client at a price less than the broker could sell under his authority,

particularly where the authority is unrevoked.... In such a case the inference may be drawn that the broker was in fact the procuring cause, and that the owner's refusal to accept the offer submitted was a subterfuge to avoid payment of commissions which the broker had fairly earned."

As Anderson–Stokes places considerable, indeed paramount, reliance on *Leimbach v. Nicholson,* we need to examine that case. Nicholson, a broker, sought to interest Leimbach in selling his farm. Leimbach agreed to consider any offer Nicholson might obtain. There was some evidence that Leimbach, at the time, set an asking price of $150,000 and understood that Nicholson would charge a flat $5,000 commission. In August, 1954, Nicholson brought the Ganns to see the property. They offered $100,000, which Leimbach refused. The Ganns were obviously interested in the property; they returned to see it a second time, when the Leimbachs were not at home. Following that visit, they offered $110,000, which Leimbach rejected. According to Nicholson, Leimbach then lowered his asking price to $125,000. A further offer of $115,000 made in November was rejected.

Mrs. Leimbach, it appears, was incensed that the Ganns had returned to the property when she was not at home and, invoking feelings apparently latent in her soul, decided that she would never consent to sell the property to anyone of the Jewish faith. When this was reported to the Ganns, they were offended and informed Nicholson that they were no longer interested in the property. Leimbach, for his part, told Nicholson that he had decided not to sell.

There was considerable dispute as to what occurred thereafter. According to Dr. Gann, in March, 1955, a friend, Edward Myerberg, informed him that he could buy the Leimbach property. He said that in April, Myerberg and the Ganns visited the Leimbachs and had a cordial conversation, that he and Myerberg then reached an agreement that, if Myerberg could obtain the property, the Ganns would take it, and that, in May, 1955, that is what happened.

Myerberg entered into a contract with the Leimbachs to buy the property for $122,500 plus a $5,000 commission to another broker, Albert Strobel, and assigned the contract to the Ganns. He did not inform the Leimbachs of the assignment until just before settlement. Leimbach denied that the Ganns had visited the property in April; he claimed that there were no further communications concerning the property following his rejection of the November offer of $115,000 until the end of April, when Strobel, a close friend, told him that he had a prospective buyer. The Leimbachs then set a price of $122,500, which, following a luncheon meeting, Myerberg agreed to pay. The contract was prepared showing a price of $127,500, the additional $5,000 apparently reflecting Strobel's commission.

When Nicholson learned of the sale, he sued the Leimbachs for a $5,000 commission. Though apparently accepting the fact of Nicholson's employment, a sharply divided Court of Appeals decided that he was not entitled to the commission. At 446–47, 149 A.2d 411, it held:

"The fact that a sale is consummated by the owners without the participation of the broker is not decisive.... The broker must establish, however, that he is the primary, proximate and procuring cause, and it is not enough that he may have planted the seed from which the harvest was reaped.... In the instant case it is clear that Nicholson did not produce a purchaser ready and willing to buy at a price satisfactory to the owners. The best offer he was able to obtain was $115,000, less a commission of $5,000. The sale effected was at a price of $127,500, or $122,500 net to the owners. In short, Strobel, or Myerberg, succeeded, where Nicholson had failed, in procuring the end result. Nicholson did not have an exclusive agency. The contract was unilateral, to pay commissions only if he produced a purchaser ready and willing to meet the owner's price.

It is of course true that an owner may not take advantage of a broker's services to secure a prospective purchaser and then deprive him of his commissions by selling

directly to his client at a price less than the broker could sell under his authority, particularly where the authority is unrevoked.... In such a case the inference may be drawn that the broker was in fact the procuring cause, and that the owner's refusal to accept the offer submitted was a subterfuge to avoid payment of commissions which the broker had fairly earned. In the relatively few cases in which the sale has ultimately been made through other means at a higher price, and where there was no prospect of success when negotiations through the first broker terminated, it has been held that the dual inference, first, that the first broker was the procuring cause of the sale, and second, that the sale at a higher price was a subterfuge to defeat the first broker's right to commissions, does not arise."

(Emphasis added.)

The Court noted that one of the cases it cited for the underscored proposition "suggests that the rule might not have been applicable if ... the buyer was desirous of purchasing the property and was willing, even before the broker's efforts ceased, to pay the price which he subsequently did pay" but found no evidence in the case before it to support such an exception. *Id.* at 447, 149 A.2d 411.

Anderson–Stokes regards *Leimbach* as "on all fours with the case at bar," and thus insists that, as the price ultimately paid by Palmer and Jarrett was higher than the best offer Decatur could obtain, Decatur could not be regarded as the procuring cause.

There are several responses to that argument. For one thing, as we observed, the *Leimbach* Court was divided. The Court then consisted of five judges, three of whom joined in the majority Opinion. The other two, Judges Hammond and Prescott, in dissent, took sharp issue with the conclusion noted above. At 450, 149 A.2d 411, Judge Hammond wrote:

"The majority opinion recognizes that the owner may not deprive the broker of commissions by selling direct to his

prospect at a lower price than the prospect had offered through the broker, for 'in such a case the inference may be drawn that the broker was in fact the procuring cause, and that the owner's refusal to accept the offer submitted was a subterfuge to avoid payment of commissions which the broker had fairly earned.' But they say that where the sale is at a higher 'price, the dual inferences that the broker was the procuring cause and of bad faith do not arise. I do not find the distinction relied on by the majority, as the very basis of the decision, to be made by the writers or the Courts. The texts and the cases say that the decisive inquiry is good faith or bad faith, or reasonableness or arbitrariness, whether the sale be for a higher or a lower price."

Judge Hammond then cited a number of cases and authorities that do indeed support his position and refute that of the majority. We note as well that we are unable to find any other court decision founded upon this distinction, and, although other language in *Leimbach* has been cited on a number of occasions, the case has not, to our knowledge, ever been cited for that proposition.

However we may question the correctness of the majority Opinion, it is obviously not within our province to disregard it. Unless and until changed by the Court of Appeals, it remains the law of Maryland. We do find the case distinguishable, however, and for that reason shall not regard it as controlling.

■ The critical principle here, which *Leimbach* itself recognizes (at 447, 149 A.2d 411), is that the owner cannot deprive the broker of his right to a commission by selling to the broker's client "at a price less than the broker could sell under his authority, particularly where the authority is unrevoked." In *Leimbach*, that did not happen. According to Nicholson, the lowest authority he had was $125,000, from which a $5,000 commission would have to be paid. The sale to Myerberg was at $127,500, less the commission. The ultimate sale, therefore, was not for a price less than Nicholson's authority. Apart from that, moreover, the sale,

from Leimbach's perspective, was to Myerberg, not to the Ganns, and Myerberg clearly was not procured by Nicholson. For either and both of these reasons, therefore, the aspect of *Leimbach* relied upon by Anderson–Stokes is simply not in point.

Unlike the *Leimbach* situation, the evidence here, though somewhat in dispute, sufficed to support a conclusion that the ultimate sale to Palmer and Jarrett was at a price that was lower than the authority given to Decatur. Decatur's last clear authority was $1.2 million; that authority remained unrevoked, and indeed Sam Muslimani asked Mr. Byrd to continue his efforts after the March 21 meeting. The ultimate sale, to the buyers procured by Decatur, was for $1,035,000. The inference that Decatur was the procuring cause was therefore permissible under the case law.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.