689 A.2d 1268

**LOYOLA FEDERAL SAVINGS BANK**

v.

**Marilee Ann HILL.**

**No. 863, Sept.Term, 1996.**

Court of Special Appeals of Maryland.

Feb. 28, 1997.

290

Anthony L. Meagher (David Clarke, Jr. and Piper & Marbury, L.L.P., on the brief), Baltimore, for Appellant.

Robert E. Sharkey (Lewis A. Kann and Gordon, Feinblatt, Rothman, Hoffberger & Hollander, L.L.C., on the brief), Baltimore, for Appellee.

Argued before MURPHY, C.J., and CATHELL, J., and MICHAEL E. LONEY, Judge, Specially Assigned.

CATHELL, Judge.

Loyola Federal Savings Bank (Loyola), appellant/cross-appellee, appeals from a judgment by the Circuit Court for Baltimore City (Alpert, J., presiding) that Marilee Ann Hill, appellee/cross-appellant, was the procuring cause of purchase by Richmond American Homes of Maryland, Inc. (Richmond American) of real property owned by Loyola and that Hill was entitled to a commission. Appellant Loyola presents three questions:

 1. Did the plaintiff fail to prove that she was the procuring cause of the sale of the property?

 2. Did the plaintiff fail to prove a customary commission of ten percent?

 3. Did the trial court err in awarding the plaintiff prejudgment interest?

Cross-appellant Hill presents three additional questions:

 ■ Did the court err in not awarding judgment to Hill for a commission on the entire 66 lots covered by the purchase agreement?

 ■ Did the court err or did it abuse its discretion in awarding prejudgment interest?

 ■ Did the court err in not awarding prejudgment interest on the entire purchase price from the date the contract of sale was entered into?

## The Facts

We include here only those facts that we perceive support the trial judge's decision and that apparently were accepted by him. In the present case, Loyola was attempting to find buyers for sixty-six parcels of property on which it was about to foreclose. There was evidence that an official of Loyola spoke with appellee for a second time shortly before the foreclosure sale and told her that Loyola had not been able to find a purchaser. Ultimately, Loyola acquired the property through foreclosure. There was evidence that appellee informed the Loyola official with whom she was dealing that she expected a brokerage agreement that would cover any persons who she produced as potential buyers. Loyola faxed information about the property to appellee. Appellee then prepared a summary and a list of potential buyers for the property and began contacting these potential buyers. She produced one potential buyer, Pulte Homes, but it did not purchase the property. During her discussions with Loyola about Pulte Homes, appellee twice brought up the matter of her commission in order to arrive at an agreed upon commission in the event she procured a buyer, and she proposed a certain commission rate. Loyola, however, never agreed to that specific rate or any other specific rate.

Eventually, appellee contacted Richmond American concerning the property. She furnished it with the information about the property that she had received from appellant. Richmond American had no prior knowledge of the property's availability. It first received this information from appellee. Appellee then, as an apparent intermediary, faxed Richmond American's financial information to Loyola. The president of Richmond American requested that appellee set up a meeting with Loyola because he wanted to make an offer for the property.

A meeting among Loyola, Richmond American, and appellee was set up for April 13, 1992. During that meeting, the history of the property, matters relating to costs, Loyola's request for a cash sale, and site work were discussed. All of

the parties then toured the subject site. At the conclusion, Richmond American renewed its expression of interest in the property and informed Loyola that it would be making an offer. After this meeting, appellee again presented to Loyola a "commission agreement." Loyola again refused to accept the agreement.

Richmond American contacted appellee informing her that it was preparing an offer and asked her to whom it should be sent. She told Richmond American to send it directly to Loyola and faxed Loyola informing it that the offer was en route. Appellee again attempted to get Loyola to agree to a specific commission agreement. Again, Loyola refused. Richmond American's first offer was proffered two days after the April 13, 1992, meeting.

After this point, Loyola and Richmond American continued purchase negotiations, and Richmond American informed appellee as to the status of the negotiations. These subsequent negotiations took place over a three-month period. Ultimately, Loyola and Richmond American agreed to terms.[1] Near the end of the negotiation period, appellee again contacted Loyola's representative about the commission agreement she had submitted. She was informed that they had not "gotten around to it." Because the agreement she had proffered was her "rock bottom" offer and because by this time she was concerned that Loyola was trying to avoid paying her a commission, she withdrew her specific commission offer. At the time she withdrew the offer, it had not been accepted by Loyola. After Loyola received her letter withdrawing her specific commission offer, it offered appellee a $15,000 finder's fee that she rejected. Appellee later was informed by Richmond American that the parties had entered into a purchase agreement and the agreement's terms. Ultimately, Loyola received $981,000 from Richmond American for some of the lots and, because of an escape clause, could not force Rich-

---

1. The actual terms are relatively unimportant to the issues of "procuring cause" and customary fees. Accordingly, we shall only address the final terms as we deem necessary.

mond American to purchase any others. Richmond American had, however, deposited $150,000 towards the lots' purchase that was forfeited to Loyola pursuant to their agreement. Loyola received a total of $1,131,000 in respect to the transaction. We shall first address Loyola's questions.

## Procuring Cause

■ *Korzendorfer Realty, Inc. v. Bufalo,* 264 Md. 293, 286 A.2d 142 (1972), was a case involving a salesman's action against Korzendorfer Realty, Inc. (Korzendorfer), the broker for whom the salesmen worked, for a portion of the commissions the broker received on a sale to a buyer procured by the salesman. The Court noted initially that the broker asserted that the salesman was not the procuring cause of the sale. The Court then discussed the law relative to the broker-seller relationship as applicable to the salesman-broker-buyer relationship. It stated:

We had occasion to consider the rule of the Maryland cases in *Ricker v. Abrams,* 263 Md. 509 [283 A.2d 583] (1971). While the broker has the burden of proving that he was the procuring cause, *Steele v. Seth,* 211 Md. 323, 328 [127 A.2d 388] (1956), the fact that the negotiations are concluded by others does not necessarily deprive the broker of his right to commissions, *Ricker v. Abrams, supra,* nor does it matter whether the broker's services are slight or extensive, whether he showed the property, or whether he participated in the execution of the contract if his efforts were the proximate cause of interesting the purchaser, and of the purchaser's ultimate agreement to buy, *Cowal v. Marletta,* 216 Md. 222, 228 [139 A.2d 712] (1958).

Bufalo was an employee of Korzendorfer Realty when Mr. Holland telephoned him, inquiring about the property. Bufalo acquainted Holland with the property, discussed it with him on two occasions, gave him such materials as were available, and then took Mr. Holland to Mr. Korzendorfer when discussions commenced regarding price. As was said in *Sanders v. Devereux,* 231 Md. 224, 231 [189 A.2d 604] (1963):

"In order for a broker to establish that he is the procuring cause of a sale of real estate, in the absence of a specific contract, the evidence must show or permit the inference that the sale was accomplished as the result of his action in discovering the purchaser, acquainting him with the property and referring him to the seller for further negotiations." [citing cases.]

264 Md. at 299–300, 286 A.2d 142.

In *Hampton Park Corp. v. T.D. Burgess Co.*, 270 Md. 269, 281, 311 A.2d 35 (1973), a case also involving whether a broker was the procuring cause of a sale, the Court first discussed several cases and emphasized certain language contained in its prior case of *Cowal v. Marletta*, 216 Md. 222, 139 A.2d 712 (1958):

"The question of whether a broker's efforts are the procuring cause of a sale is not to be determined by whether his services are slight or extensive but rather on the basis of whether the efforts he did make were in fact the *proximate cause of interesting the purchaser, and his ultimate agreement to buy . . . .*" 216 Md. at 228 [139 A.2d 712] (emphasis added).

In *Bearman v. Roland Park [Realty] Co.*, 218 Md. 515 [147 A.2d 697] (1959), we went on to say:

". . . One satisfies the legal test as a procurer of the purchaser if the testimony permits the inference that *the sale was accomplished as a result of his action* in discovering the purchaser, acquainting him with the property and referring him to the seller for further negotiations. (citations omitted)." 218 Md. at 518–19, 147 A.2d 697 (emphasis added).

The Court concluded:

In our consideration of this case, we have not been unmindful of the application of Rule 886 which provides:

"When an action has been tried by the lower court without a jury, this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly

erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses."

*Hampton Park,* 270 Md. at 284–85. The *Hampton Park* Court, in holding that no commission was there due, noted that "[t]he meaningless reference to the *location* of the subject property in the Drake Sheahan study is much too tenuous a link to establish the broker as the 'primary, proximate and procuring cause of the sale' made through Godfrey." *Id.* at 285, 311 A.2d 35.

The facts in *Hampton Park,* when contrasted with the facts in the case *sub judice, perhaps* distinguish those types of transactions for which commissions are not due from those in which they are due. In *Hampton Park,* the broker, T.D. Burgess Company (Burgess), obtained a listing agreement wherein Hampton Park Corporation (Hampton Park) promised to pay Burgess a six percent commission on any property "sold by" it. Hampton Park also agreed to pay a commission if the U.S. Post Office bought a *specific* parcel "as a result of your efforts." The agreement thus appeared to be a nonexclusive listing. Subsequently, the broker, an unauthorized member of the Post Office, and the landowner had a meeting about the availability of the property.

Some time later, a different authorized representative of the Post Office made an unannounced visit to Hampton Park's office. Mr. Malloy, the vice-president and secretary of Hampton Park, asked the representative if he had ever heard of the T.D. Burgess Company, and the representative responded that he had not. The Post Office representative learned of the site and contacted the owner on his own, independent of any knowledge of the realtor or the prior contact between Post Office representatives and the realtor. Mr. Malloy then advised Burgess that *he had been independently contacted* by some Post Office representative. At all times, Mr. Malloy disclaimed any agreement to pay a commission on the sale resulting from the authorized Post Office representative's initial contact and negotiations with him. The realtors made

no efforts to effectuate the actual sale that ultimately occurred. It was completely independent of their efforts.

*Hampton Park* was one of the few cases in which the Court of Appeals has held that commissions were not due because a broker was not a procuring cause. Its facts are far different than those in the case *sub judice*. The case at bar is more akin to *Korzendorfer, supra, Cowal, supra,* and *Sanders v. Devereux,* 231 Md. 224, 189 A.2d 604 (1963), where the Court said:

> In order for a broker to establish that he is the procuring cause of a sale of real estate, in the absence of a specific contract, the evidence must show or permit the inference that the sale was accomplished as the result of his action in discovering the purchaser, acquainting him with the property and referring him to the seller for further negotiations.

*Sanders,* 231 Md. at 231, 189 A.2d 604. *See also Ricker v. Abrams,* 263 Md. 509, 517, 283 A.2d 583 (1971); *Bearman v. Roland Park Realty Co.,* 218 Md. 515, 518–19, 147 A.2d 697 (1959); *Steele v. Seth,* 211 Md. 323, 331, 127 A.2d 388 (1956); *Atlantic Richfield Co. v. Sybert,* 51 Md.App. 74, 88–89, 441 A.2d 1079 (1982), *aff'd,* 295 Md. 347, 456 A.2d 20 (1983).

The Court of Appeals discussed the broker-seller relationship in respect to commissions in *Heslop v. Dieudonne,* 209 Md. 201, 206–07, 120 A.2d 669 (1956). The Heslop Court stated:

> [I]t is claimed that there was conduct from which it could be found that a relationship of principal and agent existed. . . . When the appellee requested permission to show the property of the appellants to prospective purchasers, both parties obviously realized the type of relationship which was being created between them. . . . [B]y allowing the appellee to show the property to various people they impliedly contracted to use the appellee as an agent for the purpose of that sale. . . . [U]nder this agency the appellants were obligated to pay the customary commission. . . .

Likewise, the Court in *Weinberg v. Desser,* 243 Md. 347, 354–55, 221 A.2d 66 (1966), in response to an owner's assertion that

the parties had "not" entered into a "contract of employment," stated:

> The argument is not valid. While there was no written or express oral contract of employment, none was necessary because an employment relationship, as the cases show, may be implied from the conduct of the parties. And although the broker has the burden of proving that he was employed, the determination of such a relationship is ordinarily a question of fact for the jury to decide. . . .
>
> . . . .
>
> . . . [S]o also the question of whether the broker was the procuring cause of the lease is ordinarily, as it was here, a question of fact for the jury. . . . [Citations omitted.]

In *Anderson–Stokes, Inc. v. Muslimani,* 83 Md.App. 267, 574 A.2d 320, *cert. denied,* 321 Md. 67, 580 A.2d 1077 (1990), determining that the original broker was the procurer of the buyer, we distinguished *Leimbach v. Nicholson,* 219 Md. 440, 149 A.2d 411 (1959), on a basis not relevant to the case *sub judice.* We, however, opined:

### Procuring Cause

As the circuit court noted, there have been literally dozens of cases in the Court of Appeals dealing with a broker's entitlement to commissions on the sale of real estate. Where the entitlement hinges on specific contractual language, that language, of course will control. Where, as here, the entitlement depends not on specific contractual terms but more generally on the employment of the broker, the issue ordinarily becomes whether the broker was the procuring cause of the ultimate sale. See Md. Real Prop. Code Ann. § 14–105. Unfortunately, like the notion of "probable cause," the concept of "procuring cause" is deceptively simple, especially when the broker seeking the commission was not directly involved in the final approach or negotiation leading to the signing of the contract of sale. . . .

. . . .

" . . . [I]f it appears that such introduction or disclosure was the foundation on which the negotiation was begun and conducted, and the sale made, the parties cannot afterwards, by agreement between themselves, withdraw the matter from the agent's hands, so as to deprive him of his commission."

The Court also recited, however, several other expressions from earlier cases. From *Cowal v. Marletta*, 216 Md. 222, 228 [139 A.2d 712] (1958) came the thought that whether a broker's efforts are to be regarded as the procuring cause of a sale is to be determined not on the basis of how much or how little he did but on the basis of "whether the efforts he did make were in fact the proximate cause of interesting the purchaser, and his ultimate agreement to buy."

83 Md.App. at 272–73, 574 A.2d 320.

We hold that that evidence we have discussed above, if believed by the trial judge, as it apparently was, was a sufficient basis for the trial judge's finding that Hill was the procuring cause of the sale to Richmond American. He did not err in that regard.

### Customary Commission Rate

In *Atlantic Richfield Co. v. Sybert, supra,* we noted that persons seeking commissions in connection with real estate transactions are required to prove by a preponderance of the evidence, that 1) there was an agreement; 2) they were the procuring cause of the sale; 3) there was a customary and usual brokerage commission; and 4) the customary commission was certain, uniform, and notorious. In that case, the salesman (an attorney) had met with an employee of the Atlantic Richfield Company (Arco) and with an officer of the ultimate buyer in an attempt to get the two together in respect to purchasing property in Howard County. The salesman, prior to the meeting, informed Arco that he expected a commission. During the meeting, Arco notified the salesman that it had another property for sale and, shortly after the meeting, sent the salesman a letter regarding the other prop-

erties it was offering. The salesman communicated the information in the letter to the purchaser. The purchaser then contacted the seller directly and purchased the property. The salesman reminded the seller that he was entitled to a commission; the seller refused to pay, and an action for the commission was commenced. We opined:

Appellant [Arco] finally contends that the appellees [persons seeking commissions] failed to meet their burden of proving that there was a customary and usual brokerage commission and that such a commission was certain, uniform and notorious. The trial court had before it the testimony of Nippard and Sybert that the agreement between them and Tracy was based upon a promise to pay the usual and customary commissions. Sybert, a lawyer with over twenty-five years of real estate experience, a member of the Board of Directors of a local bank, and counsel to the local Board of Realtors, testified that the usual commissions in the sale of industrial real estate was 10%. Nippard, also experienced in real estate transactions and counsel for the largest developer in the area, testified to the same effect. The appellees produced as an expert in the field one C. Ellsworth Iager, who established his long experience as a real estate dealer in Howard County and the Washington Metropolitan Area. He testified concerning his employment as an expert by the State Highway Administration, his testimony as an expert in various courts of the State of Maryland, and his employment as an expert by a number of financial institutions and law firms in the area involved in similar controversies. Specifically, Mr. Iager stated that he had an agreement with Contee Sand and Gravel Co. for the payment of a 10% commission in negotiating a contract for the sale of an appropriate site for the establishment of a tank farm in the general area of the "Schultz property." Iager stated that based on his experience of over twenty-five years, the payment of a 10% commission computed on the sales price was appropriate in a transaction of the kind here involved and that if a smaller commission was to be paid it would be subject to negotiation usually initiated by

the seller. The trial court found that for the relevant period here involved, the usual brokerage commission for the sale of industrial property in the Baltimore–Washington corridor, including Virginia, was 10% of the purchase price, as testified to by Iager.

*Atlantic–Richfield,* 51 Md.App. at 91–92, 441 A.2d 1079. While there was evidence to the contrary, we concluded:

> The trial judge had before him sufficient evidence to permit him to conclude that there was in fact a customary commission on the sale of industrial property.... The trial judge had the benefit of seeing the witnesses and of hearing their testimony and we cannot find on the basis of the record that he was clearly erroneous. Maryland Rule 1086.

*Id.* at 92, 441 A.2d 1079.

In the case at bar, Judge Alpert credited the testimony of appellee's/cross-appellant's expert, as being the better evidence of the customary rate of commissions, saying:

> As trier of the fact, this court had the opportunity to see the witnesses, evaluate their credibility, and measure their experience. It is beyond question that both Mr. German and Mr. Matthews were truthful, sincere witnesses. In this "battle of the experts," the record shows that Mr. German had broader experience in those kinds of real estate sales that would be more comparable to that in the instant case. Accordingly, this court finds that, in the absence of a special provision setting out the rate, that 10% is the customary rate, subject, of course, to negotiation, which obviously must precede the sale of the subject real estate. Although not controlling, the case of *Atlantic Richfield Co. v. Cornelius F. Sybert, Jr. et al.,* 51 Md.App. 74 [441 A.2d 1079] (1982), is instructive. There, the court affirmed the trial court's finding that 10% was the customary commission. As in the instant case, there was conflicting testimony as to the existence of a customary commission.

Mr. German, a vice-president of Coldwell Banker Company Realty in charge of its commercial investment, land development, and new homes division, testified on behalf of appel-

lee/cross-appellant. He had been in the real estate business since 1962, and a broker since 1972. He had participated in numerous training activities and taught real estate-related courses since approximately 1986. He had initiated and was a lecturer at real estate-related programs at the University of Baltimore and had been a lecturer in respect to zoning and commercial real estate at industry symposia. Mr. German had held several high offices in industry-related entities. He had previously testified as an expert on three or four occasions as to the value of real estate and income demographics. He had personally sold, as a salesman or broker, twenty-five to thirty commercial development tracts in the previous ten years. Mr. German was then qualified as an expert with no objection from appellant.

He testified that he was familiar with the tract because his company had been previously involved with it. After general testimony as to the neighborhood and other testimony of a general nature, he testified:

THE COURT: But you think you deserve more because it's a harder object to sell?

[A] That's correct.

. . . .

[Appellee's counsel:] Based on your 30 years of experience as a real estate broker and your special expertise in connection with commercial properties, do you have an opinion as to what the customary commission would be paid to a broker on the sale in Baltimore City in 1992 in connection with the property subject to the suit and subject to the contract Exhibits 10 and 11?

. . . .

Q Do ... you have such an opinion to a reasonable degree of certainty[?]

A Yes, I do.

Q And what is that opinion?

A I believe a sale of this nature at that time and in that location certainly commanded a 10 percent commission.

Q Now what are the reasons or basis for saying that the customary commission was 10 percent?

A Well, first it's the—I'd always understood the customary expected commission of a realtor in the sale of a property of this nature, number one. But more importantly, I think when you reflect on the period of time that this—that in our area, the economic conditions, coupled with the . . . location of the property, that the sale price certainly was an almost insurmountable task, and I think certainly deserved a full commission.

Q Now in your—

THE COURT: Is 10 percent the maximum? Is there a maximum?

THE WITNESS: No. . . . I've been involved in higher commissions.

THE COURT: When you said period of time, do you mean the year—

THE WITNESS: I meant 1992, yes.

THE COURT: Okay.

THE WITNESS: Because of the economic conditions at that time. That is, probably half of the building community was not financeable and the half that was financeable was extremely apprehensive about known—I mean, about personal signatures for AD & C Loans,[2] which many of the lenders were requiring.

. . . .

Q Mr. German, could you state to the Court any other additional bases for your opinion of the 10 percent customary commission, in addition to what you've already testified to?

A Yes. I performed considerable research, personal research as to what other brokers in the area had received in commissions for sales of this type and nature.

---

2. Acquisition, development, and construction.

Q In addition to your research, since engagement in this case, could you tell the Court what if any basis for your opinion as a result of things that you learned or studied on this subject matter over the years?

A With regard to commissions?

Q Regarding the 10 percent customary commission.

. . . .

A ... [M]y recollection has always been 10 percent commission.

Q I didn't want to interrupt. Anything else?

A It's been my ongoing, continuing experience and understanding that that is [the] customary commission for the sale of this type of property.

. . . .

Q Based on your experience, what is expected on the part of a broker in the marketing of property, such as the one in this case, in consideration for payment of a commission?

A As I stated, 10 percent.

. . . .

Q Now have all of your sales and your listings for commercial property, have they all been at a 10 percent commission, which you testified is the customary commission for this type of property?

A No, they have not.

Q And why is that?

A For various reasons that I've alluded to earlier. Oftentimes if I was to receive the sale of the houses on the property to be subdivided, I would consider receiving less of a commission. If it was a client who had given me a continuous stream of business, I would consider a less commission.

If it was a client I had been pursuing and trying to initiate a stream of business with, I would consider a lesser commission. There are circumstances. The desirability of the particular parcel, whether it would be desirable to my

clients. Many factors would go into the consideration of negotiating a lesser commission.

Q And in or about 1992, were you involved in the listing and/or the sales of development land for which you had been paid commission of 10 percent?

A Yes.

. . . .

. . . It's a customary and how does—how does one arrive at a customary commission and it's based on history. It's based on what the market will accept, it's based on what the public in general understands is a fair and reasonable compensation for the performance of a service.

Judge Alpert ultimately clarified the testimony:

[THE COURT:] Is this a fair statement? Correct me if I'm wrong. You have a commission that you'd like to get. It's about 10 percent. But it's always subject to negotiation between the parties. If the deal warrants something less, like one broker got 1.5 percent because it was $17 million. Other brokers paid whatever it may be, less because they want to get a new client or they want to keep a client who's given them a lot of business.

Is that a fair statement? That's the impression I have.

THE WITNESS: I think that's reasonably clear.

As is apparent from the trial court's opinion, it accepted the testimony we have reproduced above. The trial court credited Mr. German's expert testimony, which was introduced by appellee/cross-appellant.

 The trial judge had the opportunity at the trial to observe the witness's demeanor, judge his credibility, and pass upon the weight to be given to his testimony. *See DiTommasi v. DiTommasi,* 27 Md.App. 241, 247, 340 A.2d 341 (1975); Rule 8–131(a). He is not required to accept the testimony of the witnesses, *Stefanowicz Corp. v. Harris,* 36 Md.App. 136, 147, 373 A.2d 54, *cert. denied,* 281 Md. 738 (1977), and may credit all parts, or no part, thereof, *Staley v. Staley,* 25 Md.App. 99, 108, 335 A.2d 114, *cert. denied,* 275 Md. 755

(1975). The trier of fact is not obliged to believe all that he or she hears, *Phelps v. Goldberg,* 270 Md. 694, 705, 313 A.2d 683 (1974), and is free to believe only a portion of the evidence of each side, *Racine v. Wheeler,* 245 Md. 139, 144, 225 A.2d 444 (1967). Stated otherwise, the trial judge may believe or disbelieve, credit or disregard, any evidence introduced, and a reviewing court may not decide on appeal how much weight must be given as a minimum to each item of evidence. *Great Coastal Express, Inc. v. Schruefer,* 34 Md.App. 706, 724–25, 369 A.2d 118, *cert. denied,* 280 Md. 730, 371 A.2d 1104 (1977). When referring to the credibility of a witness, it is meant to relate to the weight to be given to the evidence by the trier of fact. *Eichberg v. Maryland Bd. of Pharmacy,* 50 Md.App. 189, 436 A.2d 525 (1981), *cert. denied,* 292 Md. 596 (1982).

We acknowledge that there was conflicting evidence and that appellant/cross-appellee proffered contrary expert testimony. It is, however, primarily the trial court's function to assess credibility. It is rare that a credibility battle can be won on appeal after it has been lost below. We cannot say that Judge Alpert clearly erred in finding that the customary commission rate, in the absence of an express agreement for property such as that at issue in the case *sub judice,* is ten percent and thereafter basing his award on that figure.

### Prejudgment Interest

■ We address all of the prejudgment interest issues raised by both parties in one discussion. The trial court awarded appellee/cross-appellant prejudgment interest from the time suit was filed. Appellant/cross-appellee argues that no prejudgment interest should have been awarded because

■ the court noted that the Plaintiff had failed to introduce any evidence of the dates of the relevant settlements, a failure of proof that should have precluded any award of prejudgment interest [and]

■ [t]here also are no equitable reasons justifying an award of prejudgment interest in this case. This is a bona fide dispute between parties to a commercial transaction. Appellee/cross-appellant asserts that prejudgment interest

should have been awarded from the date of the final purchase agreement. She argues:

[O]n December 8, 1992, when the parties finalized the purchase contract, [appellee/cross-appellant] was entitled to the customary commission, which the court found to be 10%. The customary commission was a sum certain due on a date certain. This case is within the exception to the rule, and [appellee/cross-appellant] is entitled to prejudgment interest as a matter of right on the commission earned, $206,400, from December 8, 1992.

. . . .

[Appellant/cross-appellee] has had the use (and Hill denied the use) of the money since December 8, 1992; and [appellee/cross-appellant] has had to incur substantial expense to collect what clearly is due her. Under these circumstances, equity compels an award of prejudgment interest, and it should be awarded from December 8, 1992 on the entire commission of $206,400.

The Court of Appeals recently noted in the interpleader case of *Lawhorne v. Employers Ins. Co.*, 343 Md. 111, 123, 680 A.2d 518 (1996):

In *Taylor v. Wahby*, 271 Md. 101 [314 A.2d 100] (1974), we recognized "that the usual tort rule in regard to unliquidated claims for damages [is] that interest runs from the time of the verdict." *Id.* at 113 [314 A.2d 100]. . . . *See also* 1 D. Dobbs, *Law of Remedies* § 3.6(1), at 336 (2d ed. 1993) ("[T]he general rule ... apart from statute, [is that] prejudgment interest is not recoverable on claims that are neither liquidated as a dollar sum nor ascertainable by fixed standards."). [Brackets in original; citations omitted.]

In *I.W. Berman Properties v. Porter Bros.*, 276 Md. 1, 16–20, 344 A.2d 65 (1975), the Court opined:

Generally, interest is not an inseparable and invariable incident of claims for money or unliquidated accounts. . . .

. . . .

There is, of course, a presumption that the discretion vested in the trial court "was not abused but was exercised

with just regard to the rights and interest of both the plaintiff and the defendants," *[Joseph F.] Moreland, Inc. v. Moreland,* 175 Md. 145, 149 [199 A. 871] (1938), thus the burden is upon the appellant of establishing that "according to the equity and justice appearing between the parties on a consideration of all the circumstances of the particular case as disclosed at the trial," the trial court abused its discretion and worked an injustice to the appellant by its award of interest.

In *Maxima Corp. v. 6933 Arlington Dev. Ltd. Partnership,* 100 Md.App. 441, 459, 641 A.2d 977 (1994), we said:

> The general rule is that determination of interest should be left to the discretion of the fact finder, and certain exceptions exist that are as well established as the general rule. A contractual obligation to pay a liquidated sum at a certain time and where the money has already been used are pertinent exceptions. . . .

> *See also Hartford Accident & Indem. Co. v. Sherwood Brands, Inc.,* 111 Md.App. 94, 121–23, 680 A.2d 554 (1996) (holding that prejudgment interest should have been awarded where there was a unilateral contractual obligation to pay money at a certain time); *Travel Comm., Inc. v. Pan Am. World Airways, Inc.,* 91 Md.App. 123, 188, 603 A.2d 1301 (holding that prejudgment interest could be obtained because the money due had already been used), *cert. denied,* 327 Md. 525, 610 A.2d 797 (1992).

In the case at bar, the trial court found that appellant was entitled to prejudgment interest and stated its reasons:

> This court is convinced beyond any doubt that the equities fall heavily in favor of the plaintiff who, in good faith and upon reliance on the conduct of the defendant, procured a buyer for their property. Their refusal to pay any commission was, in the opinion of this court, entirely unjustified.

The court then noted that appellee/cross-appellant had not introduced evidence as to the settlement dates and the amount

of each settlement that the trial court could utilize in determining prejudgment interest. Accordingly, it held:

The difficulty here, however, is determining the date from which that interest is to run. The burden was upon the plaintiff to establish each settlement date and the amount of each settlement from which prejudgment interest could be considered. Absent that evidence, this court will award prejudgment interest from October 21, 1994, the date suit was filed, a date after which it is known that the commission was due.

It is this finding with which appellee/cross-appellant mostly disagrees. Hill, in essence, argues that, generally, under the statute, her commission was deemed earned and payable when Loyola and Richmond American entered into the contract. We believe that appellee/cross-appellant correctly states the law, but that is not necessarily conclusive as to the result warranted in the case *sub judice*. A commission was indeed due and payable at that point, but, under the circumstances here present, how much remained open. Because the commission is percentage based, the amount of the commission depends upon the contract that was enforceable at the date of signing and the extent to which it was thereafter enforceable.

We initially note the predecessor of section 14–105 of the Real Property Article, Maryland Code (1912), Art. 2, § 17, was enacted eighty-seven years ago as Chapter 178 of the Acts of 1910. We do not feel it necessary, with specificity, to state the vast changes in the property transaction and property financing areas since the inception of the original statute. The statute's primary language (both in 1910 and now) states that, in order for a commission to be due on the signing of a land sale contract, the contract must be "valid, binding, *and enforceable.*" Md.Code (1974, 1996 Repl.Vol.), § 14–105 of the Real Property Article (emphasis added). There is no question here that the contract at issue was valid and binding. Of the three terms, "enforceable" is most susceptible to change in meaning over time. With the complexities of modern marketing, developing, and financing of real property, the term "enforceable" may take on an expanded meaning. In other

words, it becomes even more important to determine what is *the* "enforceable" contract at any given time. While the statute remains the same, the enforceability of contracts over extended periods of time may be different. Even when a statute, such as that at issue here, does not change, the results it engenders may, nevertheless, over time, change. The term "enforceable" may be different under the circumstances of different eras.

In the modern real estate market, we have concepts of future expanding property entities and rights, event driven subsequent conditions, staged purchases akin to options, and other arrangements, however phrased. We have reviewed the cases involving the right to commissions under the statute and others. The ones involving real property, for the most part, concern inapposite facts. The first case we shall discuss does not involve sales commissions. *Maxima Corp. v. 6933 Arlington Dev. Ltd. Partnership,* 100 Md.App. 441, 641 A.2d 977 (1994), cited by appellee/cross-appellant, did not involve real estate broker's commissions but a liquidated "sum certain" due a tenant from a landlord. In *Maxima,* 6933 Arlington Development Limited Partnership (Arlington) agreed to pay a tenant (whose interest was acquired by Maxima, Inc.) $260,000 as a "signing payment," $260,000 as an "occupancy payment," and an anniversary payment. Maxima argued that the trial court erred in not awarding it prejudgment interest on the balance of those payments because they were liquidated "sum certain" amounts. We noted that "[a] contractual obligation to pay a liquidated sum at a certain time and where the money has already been used are pertinent exceptions [to the general rule that determination of interest should be left to the discretion of the finder of fact] where interest is recoverable as a matter of right." *Id.* at 459, 641 A.2d 977. We held that "the tenant incentive payments were a liquidated amount *and a sum certain* that Arlington owed on *specific dates* pursuant to a contract." *Id.* at 460, 641 A.2d 977 (emphasis added).

In the case *sub judice,* no final sum certain commission was ascertainable at the signing of the contract because the

actual purchase price that Richmond American could have been forced to pay to Loyola at any given time was not a final "sum certain." When a commission depends upon a percentage of a price, the price must be a "sum certain" in order for the commission to be a "sum certain" in the nature of liquidated damages upon which prejudgment interest may be awarded. In this case, as is apparent, there is a conflict as to what is or was the enforceable purchase price, at inception, or at a given point thereafter, up to the time of the filing of suit.

*Travel Comm., Inc., supra,* also cited by appellee/cross-appellant, is likewise factually inapposite. It is a complex case with numerous issues. One was Pan American's cross-appeal for prejudgment interest on a promissory note and on sums (actually "sums certain") that Travel Committee owed Pan American on money Travel Committee received but did not remit to Pan American.

In the case *sub judice,* we shall initially examine a provision of the first contract between Loyola and Richmond American:

5. *Feasibility Period/Review of Title, Survey and Leases.*

5.1 Purchaser shall have a period of seventy-five (75) days following the execution of this Agreement (the "Feasibility Period")....

. . . .

5.5 ... If, in Purchaser's sole judgment and discretion, Purchaser decides that it does not wish to proceed with the purchase of the Property, Purchaser shall give Seller written notice of such fact on or before the end of the Feasibility Period. Upon receipt of such written notice, and provided that Purchaser shall have repaired the Property to the condition it was in prior to Purchaser's entry thereon, Seller shall return the $10,000 portion of the Deposit to Purchaser, except for $100.00 which shall be retained by Seller as consideration for the execution of this Agreement, and both parties shall be released from all further obligations under this Agreement. If Purchaser does not notify Seller of its election to terminate this Agreement as provided above, then it shall be assumed that Purchaser intends to proceed

with the purchase of each Lot comprising the Property, and the Agreement may not be terminated by Purchaser for the reasons set forth in this Section.

It was known by both appellant and appellee/cross-appellant that Loyola was attempting to sell an unfinished real property development of some scope. Feasibility periods, such as that provided for above, are not unusual in the modern real estate market. It is clear that this original contract, upon which appellee/cross-appellant apparently relies, could not have been enforceable to any degree when it was initially signed due to the feasibility period. The first contract was subsequently modified by the parties on December 8, 1992, at the conclusion of the feasibility period. There is no indication as to whether any demand for commission was made in the short interval between the expiration of the feasibility period and the modification.[3] The modification provided a schedule for the purchase of lots, additional sums of money as a deposit, and additional terms amounting to escape clauses for the purchaser. The provisions of both the original and the modified agreement made it difficult to discern what the actual purchase price, at a given point, was. But what was known as of the date of the filing of suit was that Loyola was not going to receive any further sums from Richmond American nor could it compel Richmond American to pay any further sums in respect to the purchase price. The trial court, therefore, determined that, for lack of evidence presented to him, he could only identify the final "sum certain" by that sum that was certain as of the time of filing of suit. In essence, the trial court found that the enforceable final purchase price, based upon the evidence before him, was the price paid up until that time. Accordingly, he allowed prejudgment interest from that point, the point of a final sum certain purchase price. He acknowledged that a sum certain may have been ascertainable earlier, but that the required evidence had not been presented.

---

**3.** The original contract required the purchaser to act to purchase within fifteen days of the termination of the feasibility period.

We perceive the trial court awarded commissions upon that portion of the contract it found to be enforceable and prejudgment interest from the point of filing of suit because the final sum certain was established to his satisfaction no earlier than that time. Although the contract does not expressly state that there exists continuing and increasing contract enforceability as the purchase price liability increases, the contract would, nevertheless, become enforceable as to the increasing purchase prices, and thus applicable, in stages. To hold to the contrary would be to prohibit all commissions if the contract's purchase price is not enforceable when the contract is signed, even if it later becomes enforceable. Is such a concept a reasonable application of the statute in today's world? We shall examine some of the older cases to see if such an application is prohibited by prior explicit language of the Court of Appeals or this Court.

The factual situation in *Born v. Hammond,* 218 Md. 184, 186, 146 A.2d 44 (1958), was somewhat similar, in that, initially, there was an option agreement that contained certain contingencies and certain requirements as to the method of payment of the purchase price. It was later supplanted by an actual agreement of sale that incorporated and modified the contingencies in the option agreement into specific requirements and slightly modified the method of payment of the purchase price. Hammond, the broker, initiated suit for commissions based upon the second agreement, the actual contract of sale. Born, the seller, alleged that the second contract was too indefinite to be enforceable under the provisions of section 17 of Article 2 (a predecessor statutory codification of section 14–105 of the Real Property Article). The sellers argued that the conditions, *i.e.,* requirements, made some of the contract provisions potentially unenforceable. The Court disagreed, noting that, as to the contract between the seller and buyer, upon which the commission was due, "the courts will, if possible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained." *Id.* at 189, 146 A.2d 44.

*Manning-Shaw Realty Co. v. McConnell,* 244 Md. 579, 224 A.2d 445 (1966), among other issues, involved whether a commission was due the realtor. The realtor presented to the McConnells, the sellers, a contract of sale. One of the provisions of the contract provided:

"Balance in cash on date of settlement as follows: A $4000.00 mortgage to Parkwood Building and Loan Association, payments on which are not to exceed $18.00 per week, and a second mortgage in the amount of $1600.00 to the sellers, for five years, with interest at six per cent, payments not to exceed $3.00 per week."

*Id.* at 582, 224 A.2d 445. The buyers refused to go through with the sale, relying on a failure of certain promises made to them by the broker on behalf of the sellers. The sellers denied authorizing the broker to make the representations. Eventually, the issue of whether the broker was entitled to commissions was before the Court. The Court, emphasizing the statute's enforceability requirement, noted:

Sellers contend Code, Art. 2, § 17 ... requires a contract of sale to be "valid, binding and *enforceable*" if a broker's claim for a commission is to be upheld. (Emphasis supplied.) Since this contract is not enforceable because it is too uncertain and too indefinite the broker, sellers argue, cannot "be deemed to have earned the customary or agreed commissions." In the odd circumstances here present we think there is much force in their argument.

*Id.* at 583, 224 A.2d 445.

*Borowski v. Meyers,* 195 Md. 226, 72 A.2d 701 (1950), involved whether a broker was entitled to a commission at the date of the execution of the contract of sale where the contract contained a provision permitting the buyers to rescind the contract in the event "monthly receipts" of the bar business that they bought were not as represented. The broker's contract provided that he was entitled to a commission "if said realtor produces a customer to purchase said property." *Id.* at 229, 72 A.2d 701. The sell-purchase agreement guaranteed to the buyer that "the business will gross $1000.00 per week

from the time buyers enter and take possession until settlement date." [4] The agreement further provided that if the gross receipts were below that figure, the buyers could rescind the contract.

After discussing Md.Code (1939), Art. 2, § 17, the Court opined:

Hence, a broker who negotiates a contract upon the condition that the purchaser may at his option rescind the sale and receive back the price is not entitled to commission for making the sale where the purchaser rescinds the contract, for such a contract is not a binding and enforceable contract acceptable to the employer, within the contemplation of the statute.

So, where consummation of a sale is dependant upon a condition, the principal's agreement to pay a commission to the broker is dependent upon the stipulated contingency; and if the broker acquiesces in the arrangement, and reasonable and *bona fide* efforts are made by the principal to perform the condition, but the efforts are unsuccessful, the broker is not entitled to a commission.

*Id.* at 233, 72 A.2d 701 (citation omitted).

*De Crette v. Mohler,* 144 Md. 145, 124 A. 880 (1923), cited in *Borowski, supra,* involved an oral agreement that provided for a commission for the procuring of a loan for the De Crettes, the purchasers of property. In order to be effective, the loan agreement procured by the broker required that the De Crettes had to be successful in enforcing a separate land purchase contract. The broker maintained that he was entitled to his commission when he procured the loan agreement because the loan agreement was, on its face, an enforceable agreement. The broker denied that any contingency existed in respect to the enforcement of the loan agreement. The loan agreement, however, provided that if the land purchase agreement was determined to be enforceable, the borrowers

---

**4.** The agreement was amended before signed to state "approximately $1,000.00 per week."

would form a corporation to take the property. The litigation underlying the loan agreement extended for some period including an appeal to the Court of Appeals. The De Crettes lost and no longer needed the loan to finance the purchase of the property. The trial jury found for the broker after it had been instructed to apply the provisions of Article 2, section 17. The Court of Appeals reversed, holding that the instruction should not have been given because of the uncertainties in respect to the ultimate consummation of the loan.

In *Neuland v. Millison,* 188 Md. 594, 53 A.2d 568 (1947), the broker, who had no express commission agreement with the seller, produced a buyer for the property. The buyer and seller entered into an enforceable contract. Later, the deal fell through because of an uncertainty between the parties over the description or extent of land to be conveyed. In lieu of a specific performance action, the buyer and seller entered into another agreement of compromise settling their differences arising out of the prior contract. In the suit for a commission, the broker, Neuland, and the sellers, the Millisons, actually litigated the matter of commissions based upon whether the original contract was enforceable. "The trial took the form of a hypothetical specific performance case between ... vendors and ... vendee." *Id.* at 597, 53 A.2d 568. The sellers, who won below, asserted that the sales contract was unenforceable due to the uncertainty of the property description. The Court of Appeals reversed, holding that the commission was due if the broker procured a purchaser ready and willing to purchase on the sellers's terms "notwithstanding defendants [Millisons] refused to sell and plaintiff [the broker] could not bind them or the purchaser compel them to sell." *Id.* That, of course, is general law. The Court of Appeals noted that there were two different contentions as to the existing boundaries but that, "It is immaterial which contention was correct. If either was correct ... the contract could have been enforced by defendants accordingly, plaintiff is entitled to his commission." *Id.* at 603, 53 A.2d 568.

None of the cases we have reviewed involved feasibility periods. *Borowski* did involve a power to rescind. Neither

did any of those cases involve the concept of staged purchases under a contract where each subsequent stage would only become *enforceable* upon the happening of a future event.

Appellee/cross-appellant's basic argument is that she was entitled to a commission at the customary rate (determined to be 10%) upon the maximum possible purchase price at the signing of the contract. We believe that such an interpretation serves neither sellers nor brokers where modern real estate practice frequently incorporates feasibility periods, provisions for recision, and staged purchases, *i.e.*, additional purchase prices become sums certain at a future event. In some instances, appellee/cross-appellant's position would deny brokers any commission. In other instances, sellers would be forced to pay commissions on property never sold for sums never certain.

■ The workable application, and the reasonable application of the statute's enforceability provision, is, and we so hold, that commissions are due upon the signing of the contract of sale if the sales price is then a "sum certain" for which the purchaser in a specific performance action could be compelled to pay. Thereafter, when additional "sum certain" purchase prices are established due to staged purchases, and thus become specifically enforceable, additional commissions may then be due and payable at the established (or customary, as the case may be) rate. We thus interpret the statute's provision as to enforceability to mean that commissions are due on the purchase price that could be enforceable at any respective time in an action for specific performance. To the extent that a sum certain purchase price is enforceable, commissions are due. Judge Alpert awarded commissions on the final sum certain purchase price ascertainable at the time of suit and prejudgment interest from that time. Under our view, aforesaid, he did not err.

We conclude that the *thrust* of the statute is not to require commissions to be paid on speculative purchase prices that are not "sums certain." The *thrust* of our decision is that commissions are payable based upon purchase prices that are enforce-

able. We perceive, therefore, that our holding is consistent with the statute. If enforceability were to be otherwise interpreted, as appellee desires, the statute would be so static that absurd results could occur. For instance, if a broker were to represent a buyer and find a property that the buyer wants and a contract is executed between the buyer and the seller and it is later learned that the seller's title is defective, the broker could argue that it was entitled to a commission upon the signing of the contract, because at that point on its face it was apparently enforceable. Or if a purchaser enters into a contract (similar to the end result here) that states that he/she is purchasing twenty portions of a property at stated intervals at a per parcel price, which, if all parcels are bought, would total a much greater price, but the contract provides escape clauses for the purchaser as to some of the subsequent parcels, a broker would be entitled to a commission as if all of the parcels were bought, *i.e.*, at the maximum price possible at the signing of the contract, even if only one parcel is bought and even when the purchaser could not be legally forced to purchase the subsequent parcels.

We shall hold that the trial court's interpretation of the contract was correct. The trial court based the commission on the actual purchase price paid (which was the actual purchase price that the contract required to be paid) plus the deposit available after Richmond American exercised its escape clause. Therefore, the assessment of prejudgment interest could only be determined as of the filing date because evidence of other dates was not before the court. The trial court neither erred nor abused its discretion in assessing prejudgment interest.

### Number of Lots Subject to Commission

■ The court refused to award a commission on the purchase price of all sixty-six lots. It held that appellee/cross-appellant was not entitled to a commission on the unsold lots.

■ As we have previously indicated, appellee/cross-appellant is correct in noting that under the statute, a "commission

is deemed *earned and payable when a binding contract of sale is entered into.*" (Emphasis in original.) Accordingly, we must further examine the issue of the purchase price. In doing so, we do not, as we have said, limit our scrutiny to the greatest potential purchase price, but take an expansive view in order to understand fully the intention of the purchaser and seller as to purchase price, as it is to that price that any commission—customary or otherwise—applies.

The original purchase agreement provided, as pertinent to our resolution of this issue, that closings on portions of the property were to be in stages—*i.e.*, a minimum of four lots at a time—to begin within fifteen days after the end of a feasibility period of seventy-five days. Contained within that agreement's feasibility provisions was the following:

> If, in Purchaser's sole judgment and discretion, Purchaser decides that it does not wish to proceed with the purchase of the Property, Purchaser shall give Seller written notice of such fact on or before the end of the Feasibility Period. Upon receipt of such written notice, and provided that Purchaser shall have repaired the Property to the condition it was in prior to Purchaser's entry thereon, Seller shall return the $10,000 portion of the Deposit to Purchaser, except for $100.00 which shall be retained by Seller as consideration for the execution of this Agreement, and both parties shall be released from all further obligations under this Agreement.

Subsequent amendments required Richmond American to deposit additional money, and Loyola was required to "finish" the lots prior to closing on any group of lots and set up scheduling for future settlement on lots.

The trial court found that there was no special agreement as to the rate of commission. It found that the employment agreement, though not specifying the rate of commission, "provides that the commission was due upon settlement of each lot." There was evidence supporting this finding. While the trial judge found that the prior offers made by appellee/cross-appellant had been rejected and then withdrawn,

those proposals were, nevertheless, evidence that per lot agreements were being discussed or proffered during the relevant period of time. It is clear from the beginning that this was contemplated by all parties to be a per lot transaction, *i.e.,* staged purchase. That provision, along with the purchaser's right to withdraw without consummating a purchase transaction as to unsettled lots, was understood. The subsequent modifications were such that it was reasonable, under the circumstances here present, for the trial court to determine that the contract between Loyola and Richmond American evidenced a series of contracts for the sale and purchase of subsequent parcels.[5] For the reasons we have previously expressed, we do not perceive that the trial court erred in basing its commission award on only the consummated contracts and the deposit. Even under the main contract, Richmond American could not have been required to pay a purchase price greater than that which it ultimately paid and upon which the trial court based its findings. Judge Alpert neither erred nor abused his discretion in computing commissions on that basis. For all of the reasons we have stated, we shall affirm all of the trial court's judgments.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID ONE–HALF BY APPELLANT/CROSS–APPELLEE; ONE–HALF BY APPELLEE/CROSS–APPELLANT.**

---

5. We refer elsewhere to this type of land acquisition as staged purchases.